1

2

3

4

5                  UNITED STATES DISTRICT COURT

6                 EASTERN DISTRICT OF CALIFORNIA

7

|  |  |
|---|---|
| MANUEL QUEVEDO, MARTIN ) | **1:01-cv-6443 OWW SMS** |
| HERNANDEZ, FRANSISCO V. PAZ, ) | |
| ALVARO LOPEZ, JUAN CORNEJO, JOSE ) | **MEMORANDUM DECISION AND** |
| LUIS GUERRA, MARTHA REYES, ) | **ORDER APPROVING CLASS** |
| ALFONSO CARDENAS, SOCORRO ) | **SETTLEMENT AGREEMENT.** |
| ALVAREZ, and KAREN YORK, for ) | |
| themselves and all other persons ) | |
| similarly situated, ) | |
| ) | |
|          Plaintiffs, ) | |
| ) | |
|     v. ) | |
| ) | |
| DOLE FOOD CO., INC., DOLE ) | |
| FARMING, INC., BUD ANTLE, INC., ) | |
| DOLE CITRUS, and DOLE FRESH ) | |
| FRUIT CO., ) | |
| ) | |
|         Defendants. ) | |
| ) | |
| _____ ) | |

## I. <u>INTRODUCTION</u>

     This case was filed as a class action and is being settled on a class basis.  The parties move for approval of the Settlement Agreement, as required by Fed. R. Civ. P. 23(e)(1)(A).

1

## II.   **PROCEDURAL HISTORY**

This case is a class action.  The complaint was filed on November 15, 2001.  (Doc. 1, Compl.).  The named Plaintiffs are former employees of Defendants ("Dole").  Eight of the class representatives worked at Dole's Rancho Loma, Cawelo, Famosa, and Ducor grape ranches ("Grape Ranches") and two worked at Dole's Central Valley Citrus packingshed ("Packingshed").  Dole closed the Grape Ranches on February 12, 2001, terminating 305 employees.  Some employees who worked at the Grape Ranches in January or February 2000 were not called back to work in January or February 2001 as a result of the settlement.  The Packingshed was closed on September 27, 2000, and 70 employees were terminated.

Plaintiffs allege that Dole did not comply with the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101, *et seq.* ("the WARN Act"), which requires employers to give employees 60 days notice before a plant closing or mass layoff.  *Id*. at § 2102(a).  The civil remedy is one day's pay for each day the notice is late.  *Id*. at § 2104(a)(1).  All Defendants are employers as defined by 29 U.S.C. § 2101(a)(1).  Dole admits it terminated employees without notice in violation of the WARN Act.

On July 26, 2004, Plaintiffs and Defendants jointly moved (pursuant to the settlement they had reached) to certify two classes.  (Doc. 20, Motion & Notice of Motion; Doc. 21, Pls.' Mem. in Support of Parties' Joint Motion to Certify Class, hereinafter "Joint Mem.," Ex. 1, Settlement Agreement)).  The parties moved at the same time for preliminary approval of the

settlement, for approval of notice to class members, and to set
date for a fairness hearing. (*Id.*) On September 20, 2004, the
parties' motions were granted, and two sub-classes were
certified: (1) workers who were discharged from work at the Grape
Ranches in early 2001 and (2) workers who were discharged from
the Packingshed in September 2000.[1]   (Doc. 27, Order).   In

---

[1] The Grape Ranches subclass (a) and the Packingshed
subclass (b) are formally defined in the Settlement Agreement as:

   (a)  All employees of Dole who worked at Dole's Rancho Loma,
        Cawello, Famoso, and Ducor operations and who (1)
        experienced a termination, layoff, or any other
        "employment loss" within the meaning of 29 U.S.C. §
        2102(a)(6) as a result of Dole's decision to cease
        using employees in its farming operations at these
        locations on or before February, 2001; and (2) did not
        receive written notice pursuant to the WARN Act, 29
        U.S.C. § 2101 *et seq.*, of his/her termination, layoff,
        or other employment loss at least 60 days before the
        date that the termination, layoff, or other employment
        loss took place.   Not included in this subclass are
        those employees who worked at the above locations and
        who experienced an employment loss in or about
        September, 2000 as a result of the closure of Dole's
        Central Valley Citrus packing shed in Terra Bella,
        California.

   (b)  All employees of Dole who worked at Dole's Central
        Valley Citrus packing shed in Terra Bella, California
        and who (1) experienced a termination, layoff, or any
        other "employment loss" within the meaning of 29 U.S.C.
        § 2102(a)(6) as a result of the decision to cease
        operations at this location on or about September 27,
        2000; and (2) did not receive written notice pursuant
        to the WARN Act, 29 U.S.C. § 2101 *et seq.* of his/her
        termination, layoff, or other employment loss at least
        60 days before the date that the termination, layoff or
        other employment loss took place.

(Doc. 21, Joint Mem., Ex. 1, Settlement Agreement at Notice of
Settlement p. 2; *see also* Doc. 28, Stipulation re Revised Notice
of Newspaper Publication, Ex. A. Notice of Settlement.).

3

addition, the parties' requests for preliminary approval of the

Settlement Agreement for the limited purpose of mailing notice to

class members and for approval of the process of notifying class

members were also granted.

On January 24, 2005, pursuant to the September 20, 2004,

Order, a hearing on fairness of settlement was held.  (*See* Doc.

33, Minutes).  However, Plaintiffs filed their original

memorandum and other papers in support of their Settlement

Agreement on January 20 and 21, 2004, just days before the

hearing.  (See Docs. 29-32).  At the time of the January hearing,

Plaintiffs' counsel did not yet know the identities of all class

members who had filed valid claims or what dollar amount each

class member would receive.  Because the distribution of the

settlement proceeds was not available for the Court's timely

review, the fairness hearing was continued to March 28, 2005.

(Doc. 35, Order, filed Feb. 5, 2005).

Plaintiffs filed a supplemental memorandum in support of the

Settlement Agreement on March 14, 2005, that includes information

regarding:  the identities of class members whose claims were

approved; the identities of class members whose claims were

rejected; distribution of settlement proceeds to approved class

members; and the one objection that has been filed against the

Settlement Agreement.  (Doc. 36, Pls.' Supp. Mem. 2).  Defendants

filed no memorandum in support of or opposition to the

settlement.  Plaintiffs note in their memorandum that:

> Dole joined in the motion for class certification only for
> the purpose of settlement.  It reserved the right to oppose
> class certification if, for some reason, the settlement is
> not approved.  The description of the law in this brief with
> respect to class certification comes only from plaintiffs.

**4**

(*Id.* at 7, n. 2).

A fairness hearing was held on March 28, 2005.  Cynthia L. Rice of the California Rural Legal Assistance Foundation appeared in person on behalf of Plaintiffs.  Paul Strauss appeared telephonically on behalf of Plaintiffs.  William D. Claster appeared telephonically on behalf of the Dole  Defendants.  No objectors appeared.

### III.   <u>FACTUAL BACKGROUND</u>

#### A.   <u>The Parties' Disagreement as to Remedy under the WARN Act.</u>

The facts of the case are uncontested, but the parties disagree as to the remedy afforded by WARN.  Dole does not dispute that it terminated employees without giving the 60 days notice required by the WARN Act.  Dole disputes the way in which the remedy is calculated.

Dole employed permanent seasonal employees who worked intermittently, but had an expectation of returning to work each season.[2]  However, because the nature of the employees' work is seasonal, employees often worked at different periods throughout

---

[2] The WARN Act contains an exemption for "temporary" employees.  29 U.S.C. § 2103.  If employees hired for harvesting understand that their work was temporary when they were hired, then they fall within this exemption.  *See* 20 C.F.R. § 639.5(c)(3).  However, if employees do not expect their work to be temporary, and the employer treats them as returning seasonal employees, then they do not fall within the exemption.  *See* *Marques v. Telles Ranch*, 867 F. Supp. 1438 (N.D. Cal. 1994).  The parties do not dispute that the seasonal employees here do not fall within the exemption.  (*See* Doc. 36, Pls.' Supp. Mem. 5).

the year.  Some were not working at the time of the shutdown and did not reasonably expect to be employed during the 60 days following the shutdown.  Such employees would not have suffered an "employment loss" as a result.  *Marques v. Telles Ranch*, 867 F.3d 1331, 1335 (9th Cir. 1997).  Some of the employees might have been employed for only a few days during the 60-day notice period, and others would have been employed for the full 60 days.

Plaintiffs argue that Dole is liable to all employees for a full day's wages times 60, regardless of whether they would have been employed at all, whether they would have been employed for less than the 60-day period, or whether they would have been employed for the entire 60-day period.  Dole argues that the employees are only entitled to what they would have actually earned in the 60 days after the closing of the Grape Ranches and Packingshed.  (*See* Doc. 36, Pls.' Supp. Mem. 6).

The Circuits are split as to which remedy calculation method applies.  The Third Circuit holds that an employer who failed to give notice in violation of the WARN Act owes each employee one day's wages times 60 calendar days, regardless of whether the worker would have actually worked fewer than 60 calendar days during that period.  *United Steelworkers of Amer. v. North Star Steel Co.*, 5 F.3d 39 (3d Cir. 1993).  The Ninth Circuit (along with the Fifth, Sixth, Eighth, and Tenth Circuits) favor Dole's position, and hold that an employer in a WARN Act case only owes its employees for the days that the employee actually would have worked.  *Burns v. Stone Forest Indus., Inc.*, 147 F.3d 1182, 1184 (9th Cir. 1998), cited with approval in *Local Joint Exec. Bd. Of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d

**6**

1152, 1159 (9th Cir. 2001); *Carpenters Dist. Council of New Orleans v. Dillard Dept. Stores, Inc.*, 15 F.3d 1275, 1283-5 (5th Cir. 1994); *Saxion v. Titan-C-Mfg., Inc.*, 86 F.3d 553, 560-1 (6th Cir. 1996); *Frymire v. Ampex Corp.,* 61 F.3d 757, 771-2 (10th Cir. 1995); *Breedlove v. Earthgrains Baking Co., Inc.*, 140 F.3d 797, 801 (8th Cir. 1998).

A district court is bound to follow the law of its circuit, even if there are inter-circuit conflicts. *Hasbrouck v. Texaco, Inc.*, 663 F.2d 930, 932-3 (9th Cir. 1981). Under the Ninth Circuit view, Plaintiffs' counsel has estimated that Plaintiffs and the class would receive approximately $467,000.00.[3] Under the alternate theory, Plaintiffs' counsel has estimated that the class would recover up to $1,364,000.00. (Doc. 36, Pls.' Supp. Mem. 6).

**B.   Notice to the Class & Claims Process.**

**1.   Notice to the Class.**

On or before October 8, 2004, Gilardi & Co. (the Claims Administrator upon whom the parties agreed) mailed notice packets to 545 potential class members, and also published notice by

---

[3] Plaintiffs assert that *Burns*, the Ninth Circuit case, is factually distinguishable, although do not explain why the rule established in that case regarding calculation of damages would not apply here. (Doc. 36, Pls.' Supp. Mem. 6). The employees in *Burns* were workers in a timber plant. The Ninth Circuit dealt with the issue of calculation of damages under the WARN Act as a matter of first impression, and held that damages are calculated by work days, not calendar days. *Burns*, 147 F.3d at 1183 ("We join most of the other circuits that have ruled on the issue in construing the statute to mean work days."). The Court did not indicate there are any exceptions to this rule.

newspaper and radio.  (Doc. 32, 01/19/05 Rice Decl. ¶ 3; Doc. 31, Salazar Decl. ¶¶ 5-8, Ex. B, Notice Packet).  Gilardi & Co. made a toll-free telephone number available to claimants to answer questions about the Settlement Agreement and the claims process.  (Doc. 31, Salazar Decl. ¶ 9).  The individuals were identified by Plaintiffs' counsel based on payroll records provided by Dole.  (*See* Doc. 36, Pls.' Supp. Mem. 11; Doc. 32, 01/19/05 Rice Decl. ¶ 4).  Workers at the Grape Ranches who were last employed by Dole in January or February 2001 and 2000, and workers at the Packingshed who were last employed from June 29, 2000, to September 29, 2000.  (Doc. 36, Pls.' Supp. Mem. 9; Doc. 32, 03/11/05 Rice Decl. ¶¶ 5-6).

The packets were to be returned 90 days after October 8, 2005, on January 6, 2004.  (01/19/05 Rice Decl. ¶ 3).  The notice packets stated the deadline for submission of claims of January 6, 2004.  (Doc. 31, Salazar Decl., Ex. B, Notice of Class Action 3).  The notice packets also stated the Hearing on Fairness of Settlement would be held on January 24, 2005, before Judge Oliver Wanger of the United States District Court for the Eastern District of California at the courthouse in Fresno.  (*Id*. at 4).

In addition to mailing notices to potential class members, Gilardi & Co. published a court-approved summary notice in Spanish-language newspapers on November 5, 7, 12, and 19, 2004.  (*Id*. at ¶ 7).  Gilardi & Co. also aired announcements on two Spanish radio stations from November 4, 2004, to January 6, 2005, and November 9, 2004, to January 6, 2005.  (*Id*. at ¶ 8).  The toll-free telephone line was answered in both Spanish and English from 9 a.m. to 4:30 p.m., Monday through Friday.  (*Id*. at ¶ 9).

**8**

After mailing and publication, Gilardi & Co. sent additional notices to individuals who requested them. (Doc. 31, 01/20/05 Salazar Decl. ¶ 6, Ex. C). When approximately of the notices were returned, Gilardi & Co. sought alternative addresses by conducting electronic searches through a locator service and obtained correct notices for fifty-one individuals to whom the packets were subsequently re-sent. (*Id*. at ¶ 13).

### 2. **Claims Process**.

Counsel received a total of 571 claims.[4]  Of these, 534 were postmarked before January 6, 2005.   Four claims were postmarked after January 6, 2005, but before January 18, 2005.[5]  Plaintiffs received 33 additional claims after January 18, 2005. (Doc. 36, Pls.' Supp. Mem. 8, 14).  Plaintiffs' counsel recommends including the late claims that are from persons properly included in the class.  A total of 5 of the 37 late claims are from individuals Plaintiffs' counsel has determined are eligible for class participation.  (Doc. 38, 03/14/05 Rice Decl. ¶¶ 12, 13). These individuals were included in the proposed distribution. (*See* Doc. 41, Soule Decl., Ex. 1).

Plaintiffs' counsel reviewed and evaluated each claim to

---

[4] Of these, 77 requests were from individuals who never filed claim forms.  (Doc. 42, 03/14/05 Heard Decl. ¶ 6). Plaintiffs do not make clear how the requests of these individuals were made, by writing, telephone, or some other method.

[5] Plaintiffs use this date because they assert they submitted their papers in support of the first fairness hearing on January 18, 2005.  The date of filing on the official docket, however, is January 21, 2005.

**9**

determine whether the claimants were class members and entitled
to a portion of the settlement.  Claimants who were employed at
the Grape Ranches were determined to be class members eligible to
receive damage awards based on a record of employment in January
or February of 2001 and 2000.  (Doc. 41, 03/14/05 Soule Decl. ¶
4).  Claimants who were employed at the Packingshed were
determined to be class members eligible to receive damage awards
based on a record of employment from June 29, 2000, through
September 29, 2000.  (*Id.*).

Plaintiffs' counsel accepted 361 of the 571 claims.[6]
Plaintiffs' counsel asserts that "each individual was denied
because they did could not [sic] demonstrate that they had worked
during the periods of time used to determine whether or not a
worker was affected."  (Doc. 36, Pls.' Supp. Mem. 15).  Claimants
could prove they received wages by either appearing on Dole's
payroll records or by showing a dated pay stub.  Plaintiffs
included in the class claimants who could prove they received
wages in January or February 2000 (from the Grape Ranches), but
were not called back to work at the Grape Ranches in January or

---

[6] Gilardi & Co. sent 274 denial notices to claimants on Feb
16, 2005.  Of the 274 denial notices, 63 were actually valid
claim members to whom a denial had been sent by mistake.  (Doc.
38, 03/14/05 Rice Decl. ¶ 7).  Of the 274 individuals who were
notified of denial, approximately 96 contacted Gilardi & Co. or
Plaintiffs' counsel and asserted they were in the class.  (Doc.
36, Pls.' Supp. Mem. 13).  Of the 96 individuals, 47 were
properly within the class, and were subsequently included.  (*Id.*
at 15).  Forty-nine (49) were found not to be ineligible, and
they were subsequently informed again that their claim was
denied.  (*Id.*).  Ultimately, all 63 individuals who had been
improperly denied were included in the proposed settlement
distribution.

February 2001 as a result of the shutdown.  (*See* Doc. 41, Soule

Decl. 2).  Plaintiffs assert these claimants were included in the

class because they could have expected to be called back to work

in January or February 2001 as a result of the shutdown.

Plaintiffs state that many claims were denied because the workers

would not have been called back in January or February 2001, but

instead would have been called back in March 2001 or later, and

therefore did not fall within the notice period.  *See Marquez*,

867 F. Supp. at 1445.

Plaintiffs' counsel mailed official notices to workers at

the Grape Ranches in January or February 2000, but not to workers

who worked at the Packingshed in June - September 1999.

Plaintiffs' counsel explained at the fairness hearing that the

June - September 1999 workers were included in the class because

they had all already been called back to work by June - September

2000.  For the 2000 Grape Ranches workers this was not the case.


### 2.   Objections & Opt-Outs.

Plaintiffs state in the introduction to their brief that one

of their purposes is to "advise the court of the objection that

was submitted."  (Doc. 36, Pls.' Mem. 2).  No formal objections

were filed with Plaintiffs' counsel or with Gilardi & Co.  (*Id*.

at 15).  No objections were filed with the Court and no objectors

appeared at either the January 24, 2005, or the March 28, 2005,

fairness hearings.  Ninety-six individuals whose claims were

denied advised Plaintiffs' counsel or Gilardi & Co. that they

were not satisfied with the outcome.  The claims of each of these

persons was reviewed twice.  Some of these individuals were

11

1   included in the distribution.

2       However, one individual, Gloria Cassaneda, submitted an opt-

3   out form.  Plaintiffs' counsel stated at the March, 28, 2005,

4   fairness hearing that Gilardi & Co. attempted to contact this

5   individual but had not been successful.  This individual does not

6   appear on Dole's payroll records and does not appear to be a

7   member of the class.  (Doc. 36, Pls.' Supp. Mem. 16).  A total of

8   forty individuals filed both a claim form and an exclusion form.[7]

9   (*See id*.; Doc. 42, 03/14/05 Heard Decl. ¶ 8).  At the direction

10  of Plaintiffs' counsel, Gilardi & Co. contacted each of these

11  individuals, and received letters from 37 claimants indicating

12  they want to participate in the settlement and did not want to

13  opt out.  (*See id*.).  Gilardi & Co. has not heard back from the

14  remaining three individuals, Antonio Moreno, Javier Ramirez

15  Almanza, and Aurora Gallegos.  Based on Plaintiffs' counsels'

16  review of the payroll records, these three individuals and Gloria

17  Cassaneda do not appear to be class members.

18

19      **D.   The Parties' Settlement Agreement.**

20          **1.   Settlement Agreement Provisions.**

21      The Settlement Agreement provides that "Dole will pay

22  $1,017,500.00 to plaintiffs and class members," and "[t]hat

23  amount will be divided up *pro rata* among class members who file

24  claims" based on a specific calculation agreed upon by the

25

26          [7] Some of the claims & exclusion forms for this group of
    claimants were received after the deadline January 6, 2005.
27  Plaintiffs' counsel recommends including the claims from
    individuals who are class eligible.  (Doc. 36, Pls.' Supp. Mem.
28  16).

parties.  Based on Plaintiffs' counsel's review of claims, 361 of the 571 claims are class members and entitled to a portion of the settlement.  The Settlement Agreement also provides for Dole's payment of Plaintiffs' attorneys' fees and all expenses related to the administration of the proposed settlement and processing of claims.  (*See* Doc. 36, Pls.' Supp. Mem. 8; Doc. 21, Joint Mem., Ex. 1, Settlement Agreement).

First, the Settlement Agreement provides that "Dole will pay $1,017,500.00 to plaintiffs and class members."  (Doc. 21, Joint Mem., Ex. 1, Settlement Agreement § 5).  "Plaintiffs' counsel will propose allocation of payments to class members *pro rata*, based on a reasonable approximation of what they would have received if this case was tried and plaintiffs prevailed."  (*Id.* at § 6).  The Settlement Agreement does not contain a description of the particular *pro rata* distribution calculation to be used. However, the 03/14/05 Soule Declaration (Doc. 41 at ¶ 5) states:

> The damage amount computed for eligible claimant was based on their average daily earnings for all days worked in the 60 days prior to their last date worked, as determined from the Dole payroll data.  This average daily rate was multiplied by 60 to determine each employee's 60-days pay amount.

Thus, each class members' share is based on their average daily wage multiplied by sixty, regardless of the number of days they worked in the 60 days preceding the shutdown.

Second, the Settlement Agreement provides that $25,000.00 of the $1,017,500.00 will be set aside as a reserve that is to provide funds for the payment of late claims and to cure errors:

> In calculating the amount of money that should be paid to claimants, plaintiffs will direct the claims administrator to keep a reserve of $25,000.00.  This money will be used to

> pay late claims and cure errors made in the calculation or distribution of settlement payments.  The claims administrator will be directed by plaintiffs' counsel (making reasonable judgments and exercising reasonable discretion) to make payments to claimants from this reserve to provide payment for class members who filed late claims or to cure errors with respect to the calculation or distribution of settlement payments.  No part of these funds will be paid to plaintiffs' counsel.

(Doc. 21, Joint Mem., Ex. 1, Settlement Agreement § 30).  The reserve leaves $992,500 available for payment to claimants who qualify as class members.

"Late claim" is not defined in the Settlement Agreement.  At the fairness hearing, Plaintiffs' counsel explained that it was the intent of the parties that errors and pay other late claims that may arise.  The Settlement Agreement provides that unclaimed or undistributed funds will be distributed to the Monterey County Housing Alliance.  (Doc. 21, Joint Mem., Ex. 1, Settlement Agreement § 34).

Third, the agreement provides that Dole will pay the costs of administering the claims:

> Dole will pay the fees of the claims administrator and any other costs of settlement administration provided for in this agreement, including but not limited to the costs of reproducing and mailing notice to the class, translating written communications with class members, preparing settlement checks and distributing those checks, and the cost of any other appropriate mailings or communications to class members or claimants.  Dole will not be responsible for any additional fees or expenses of plaintiffs' counsel, other than what is expressly authorized by this agreement.

(*Id.* at § 38).

Fourth, the Settlement Agreement provides that Dole will pay attorneys' fees, which are to be funded separately and apart from the $1,017,500 settlement amount for the farm workers:

14

1  Dole will pay $94,442.00 to plaintiffs' attorneys for work
   performed through December 18, 2002 and will pay an
2  additional $24,850.00 to plaintiffs' attorneys for costs and
   expenses they incurred through that date.  Dole will also
3  pay up to but no more than $50,000.00 to plaintiffs'
   attorney's for work, costs, and expenses incurred after
4  December 18, 2002.

5  (*Id.* at § 39).

6

7              **2.    Distribution of the Settlement Fund.**

8        As discussed above in brief, the damages for each claimant

9  who qualifies as a class member is the individual's average daily

10 wage multiplied by 60.  This is a variation of the "calendar

11 days" distribution employed by the Third Circuit in calculating

12 damages in WARN Act cases.  *See United Steelworkers*, 5 F.3d at

13 43-4.  The average daily wage for each individual was calculated

14 by determining the average daily earnings for all days worked in

15 the 60 days prior to that individual's last date worked.  The

16 figures were obtained from payroll data provided by Dole.  (*See*

17 Doc. 41, Soule Decl. ¶ 5).

18       Based on this calculation, the total amount due all

19 claimants who qualify as class members is $1,133,037.  (Doc. 36,

20 Pls.' Supp. Mem. 9).  However, pursuant to the Settlement

21 Agreement, there is only $992,500.00 available to pay class

22 claims (when the $25,000 reserve is subtracted).  Plaintiffs

23 decided not to include interest in this calculation because "the

24 base amount of wages due already exceeded the amount available to

25 pay out claims."  (*Id.* at 9, n. 4).  Plaintiffs also decided to

26 reduce each claims amount proportionally in order to arrive at a

27 total payout of $992,500.00.  (*Id.* at 9-10). The approximate

28 range of awards as a result of this calculation is a low of about

                                  **15**

1  $2,000.00 to a high of about $4,500.00.  (*Id*. at 10; *see also*

2  Doc. 41, Soule Decl., Ex. A, "Quevedo v. Dole Proposed

3  Distribution").

4

5  　　　　　　　**3.   Attorneys' Fees.**

6  　　　The Settlement Agreement provides that Dole will pay

7  Plaintiffs' counsel a maximum of $169,292.00, in fees, costs, and

8  expenses for work done on this case.  (Doc. 39, 03/14/05 Strauss

9  Decl. ¶ 4; Doc. 31, Joint Mem., Settlement Agreement § 39).  This

10 includes the $94,442.00 for plaintiffs' attorneys' work prior to

11 December 18, 2004; $24,850.00 for plaintiffs' attorneys' costs

12 and expenses prior to December 18, 2004; and the maximum

13 allowable amount of $50,000.00 for plaintiffs' attorneys' work,

14 costs, and expenses incurred after December 18, 2004.  (*See id*.)

15 　　　The Settlement Agreement provides that the payments of

16 attorneys' fees "are contingent upon plaintiffs' counsel

17 providing to Dole and to the Court appropriate documentation to

18 support fees, costs and expenses."  (*Id*.)  Section 39 of the

19 Settlement Agreement does not explain how the $94,442.00 figure

20 for work done before December 18, 2004, was calculated.  However,

21 Plaintiffs' counsel have submitted declarations explaining the

22 work done, as required by the Court's February 3, 2005, Order.

23 (*See* Doc. 39, 03/14/05 Strauss Decl.; Doc. 38, 03/14/05 Rice

24 Decl.; Doc. 35, Order).

25 　　　Plaintiffs are represented by Paul Strauss (of Miner,

26 Barnhill & Galland) and Cynthia Rice (of the California Rural

27 Legal Assistance Foundation ("CRLA Foundation")).  Paul Strauss

28 submitted a declaration describing the work completed by his law

**16**

firm through February 15, 2005, and attached time records for

hours worked by his law firm, and Mr. Strauss' curriculum vitae.

(Doc. 39, 03/14/05 Strauss Decl. ¶ 10; Doc. 40, Appendix).

Cynthia Rice submitted a declaration describing the work

completed by the CLRA Foundation, and attached time records for

hours worked by the CLRA Foundation through March 11, 2005, and

Ms. Rice's curriculum vitae.[8]  (Doc. 39, 03/14/05 Rice Decl. ¶

20).

Mr. Strauss asserts that Plaintiffs' counsel have spent

substantially more than $169,292, the maximum amount provided for

attorneys' fees by the Settlement Agreement, on this case.  (Doc.

39, 03/14/05 Strauss Decl. ¶ 5).  Mr. Strauss asserts that the

fees, costs, and expenses of Miner, Barnhill & Galland alone

amount to almost $200,000.00.  (*Id*.).  Ms. Rice asserts that the

total fees and costs sought by the CLRA Foundation is $70,096.65.

(Doc. 38, 03/14/05 Rice Decl. ¶ 23).  This means that the total

of Plaintiffs' counsels' fees, costs, and expenses amounts to

approximately $270,000.

Plaintiffs' counsel, however, are not seeking to be

reimbursed for more than the maximum amount allowed by the

Settlement Agreement.  (Doc. 39, 03/14/05 Strauss Decl. ¶¶ 6a,

---

[8] The CRLA Foundation is a non-profit legal services
organization that does not charge their clients for services.
(Doc. 38, 03/14/05 Rice Decl. ¶ 20).  Plaintiffs' counsel stated
during the March 28, 2005, fairness hearing that the CLRA
Foundation does not receive federal funds.  The CLRA Foundation
may collect attorneys' fees in contingency fe cases such as
these.

17

6b; Doc. 38, 03/14/05 Rice Decl. ¶ 23).[9]  Plaintiffs' counsel instead seek to show why an award of the maximum amount allowed (i.e., $169,292), is justified.  Defendants do not objected to payment of this amount.  In addition, payment of the $169,292.00 would not reduce the award to Plaintiffs, which is separate and apart from the attorneys' fees.

The fees incurred by Miner Barnhill & Galland working in this case through February 15, 2005, are as follows:

**Attorneys:**

| | | | | | |
|---|---|---|---|---|---|
| Paul Strauss | 317.20 | x | $380.00 | = | $120,536.00 |
| Steve Schneck | 79.30 | x | 355.00 | = | 28,151.50 |
| Marni Willenson | 1.60 | x | 250.00 | = | 400.00 |
| Rebecca Onie | 18.90 | x | 190.00 | = | 3,591.00 |
| Geoffrey Rapp | 4.00 | x | 190.00 | = | 760.00 |
| Carolyn Shapiro | 0.80 | x | 190.00 | = | 152.00 |

**Paralegals:**

| | | | | | |
|---|---|---|---|---|---|
| Paralegals[10] | 51.70 | x | 105.00 | = | 5,428.50 |
| Michelle Cubano-Guzman | 21.80 | x | 130.00 | = | 2,725.00 |

**Law Student:**

---

[9] On page 2 of Mr. Strauss' Declaration, there are two consecutive paragraphs labeled "6."  The first of these paragraphs will be referred to as "6a" and the second of these to "6b."

[10] The paralegals under this entry are not identified, other than Ephraim Camacho, who did work for and was paid by both Miner Barnhill & Galland and the CLRA Foundation.  (*See* Doc. 39, 03/14/05 Strauss Decl. ¶ 30).

18

1  Aurthr Luk        2.40    x     130.00 =      312.00

2                       **TOTAL FEES   = $162,156.00**[11]

3  **Costs & Expenses:**                        36,907.49

4            **TOTAL FEES, COSTS & EXPENSES   = $198,063.49**

5  (*See* Doc. 39, 03/14/05 Strauss Decl. ¶ 10).

6       The total costs and expenses incurred by the law firm, based

7  on records of bills, invoices, and payment of litigation

8  expenses, totals $36,907.49.  These expenses include computer and

9  data expert/consultant Whitman Soule, for work through March 10,

10  2005;[12] fee for mediator Mark S. Rudy;[13] travel/transportation;

11  hotels and meals during travel; Westlaw; Federal Express; Court

12  filing fees; long-distance and conference call exchanges; and in-

13  house copying.  Mr. Strauss did not submit receipts and records

14  for these expenses, but can provide them to the Court if

15  necessary.  (*Id*. at ¶¶ 12-3).

16       The total fees, costs and expenses incurred by the CLRA

17  Foundation through March 11, 2005, are as follows:

18  **Attorneys:**

19

20

21  [11] Mr. Strauss' Declaration states that the total is
$162,165.00.  (*Id*. at ¶ 10).  In fact, the total is $162,156.00.

22

23  [12] Mr. Soule has 20 years of experience working with
payroll, personnel, and computer records to turn them into a
functional computer database and produce reports, charts, and
24  tables describing the data.  (Doc. 39, 03/14/05 Strauss Decl. ¶
32).  Mr. Soule used Dole's payroll records to provide
25  alternative damages calculations, identify class members,
calculation individual claimants' damages, and report on the
26  validity of individual claims.  (*Id*. at ¶ 34).

27

28  [13] The role of Mark S. Rudy was not made clear by the
parties.

1        Cynthia Rice    202.75    x    $325.00 =    $65,893.75

2    **Community Worker/Legal Assistant/Interpreter:**

3        Ephraim Camancho 31.50    x    105.00 =    3,307.50

4    **Travel, copying, mailing expenses:**    895.40

5            **TOTAL FEES, COSTS & EXPENSES    =   $70,096.65**

6    (Doc. 38, 03/14/05 Rice Decl. ¶ 22, Exs. C, E, F).

7        The attorneys and paralegals at Miner Barnhill & Galland are

8    all highly-qualified with experience in employment

9    discrimination.  (Doc. 39, 03/14/05 Strauss Decl. ¶¶ 18-31); *see*

10   *also In re Arthur L. Lewis*, 212 F.3d 980 (7th Cir. 2000) ("Miner,

11   Barnhill & Galland is a small law firm specializing in

12   employment-discrimination litigation.  Many persons affiliated

13   with the firm have national reputations for quality work on

14   plaintiffs' behalf.").

15       Ms. Rice has been a licensed attorney in California for 25

16   years and has specialized in labor and civil rights law both in

17   private practice and as an employee for various non-profit legal

18   service providers such as the CLRA Foundation.  (Doc. 38,

19   03/04/05 Rice Decl. ¶ 19).  CLRA Foundation is a non-profit legal

20   services organization that does not charge clients for services.

21   Ms. Rice and CLRA's legal assistant/interpreter Mr. Camacho

22   therefore do not have a standard hourly rate.  (*Id.* at ¶ 20).

23   Ms. Rice based her hourly rates on her knowledge of billing

24   practices on a review of U.S. District Court cases which address

25   the issue of reasonably hourly rate in northern California.  She

26   did not cite any cases, however.  Ms. Rice based Mr. Camacho's

27   hourly rates on her knowledge of billing practices of paralegals.

28   (*Id.* at ¶ 21).

## IV.   LEGAL ANALYSIS

### A.   Legal Standard.

Fed. R. Civ. P. 23(e) provides that "the court must approve any settlement...of the claims, issues, or defenses of a certified class."  The role of the District Court is to determine whether the notice and claims procedure was fair, and whether the Settlement Agreement as a whole is fair, adequate, and reasonable. *Officers for Justice v. Civil Serv. Comm'n of City and County of San Francisco*, 688 F.2d 615, 624-5 (9th Cir. 1982).

First, the notice and claims procedure must be fair and reasonable:

> the class must be notified of a proposed settlement in a manner that does not systematically leave any group without notice; the notice must indicate that a dissident can object to the settlement and to the definition of the class; each objection must be made a part of the record; those members raising substantial objections must be afforded an opportunity to be heard with the assistance of privately retained counsel if so desired, and a reasoned response by the court on the record; and objections without substance and which are frivolous require only a statement on the record of the reasons for so considering the objection.

*Id.*

Second, the settlement must be fair, adequate, and reasonable.  Factors to consider in the second part of the analysis include:

> risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; experience and views of counsel; presence of a government participant; and reaction of the class members to the proposed settlement.

*Id.* at 625; *see also Molski v. Gleich,* 318 F.3d 937, 953 (9th

Cir. 2003); *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1242 (9th Cir. 1998).

"However, where the court is confronted with a request for settlement-only class certification, the court must look to the factors designed to protect absentees." *Molski*, 318 F.3d at 953 (internal quotations omitted). "In addition, settlements that take place prior to formal class certification require a higher standard of fairness." *Id*.

### B. __Whether the Notice Procedure was Fair and Reasonable.__

The law requires that the class be notified of a proposed settlement in a manner that does not systematically leave any group without notice. Officers for Justice, 688 F.2d at 625. It does not appear that plaintiffs' notice procedures systematically left out any group. Plaintiffs, through Gilardi & Co., mailed 545 notice packets to potential class members. Gilardi & Co. received 571 claims, at least 361 of which were deemed valid. A total of 361 are on the proposed distribution list.

The address list was compiled based on Dole's payroll records; Grape Ranches workers in January or February 2000 and 2001 and Packingshed workers from June 29 to September 30, 2000, were included. At the time of the Settlement Agreement, the plaintiffs believed that the only Grape Ranches workers affected by the shutdown were those who were on the job in January and February 2001. However, plaintiffs discovered after the claims process began that some of the January or February 2000 workers had not been called back to work in January or February 2001 as a result of the shutdown. Plaintiffs' counsel stated during the

22

1    fairness hearing that the January or February 2000 workers were

2    then included in the class if they could reasonably have expected

3    to be called back to work in January or February 2001.

4    Plaintiffs' counsel also stated that notice packets were

5    subsequently sent to the January or February 2000 workers as

6    well.

7        Notice packets were not sent to a group of "June to

8    September 1999" Packingshed workers because all of the June to

9    September 1999 workers had already been called back on the job

10   once the shutdown occurred.   There were no 1999 Packingshed

11   workers who were not called back to work in 2000 as a result of

12   the shutdown.

13       It is clear that Plaintiffs' counsel made considerable

14   efforts in providing notice to potential class members and

15   organizing the claims procedure.   They hired an expert, Mr.

16   Soule, to assist them in interpreting the payroll records

17   provided by Dole so that they could both identify class members

18   and determine their average daily wages.   Plaintiffs' counsel

19   worked closely with the claims administrator, Gilardi & Co., to

20   mail 545 individual notice packets to potential class members.

21   They reviewed claims forms to determine whether the claimants

22   were properly included in the class.   They included the January

23   or February 2000 workers in the class when they discovered this

24   group of individuals were not called back to work in 2001 when

25   they reasonably could have expected to be.   They included in the

26   class, workers with pay stubs from the relevant time periods,

27   even when the individuals did not appear on Dole's payroll

28   records.   They worked with Gilardi & Co. to review forms of

correspondence other than claims forms that were received from

potential class members.  They set up and maintained a toll-free

telephone number, with English-speaking and Spanish-speaking

representatives, to field calls from potential class members.

They arranged for Gilardi & Co. to post notice of the class

settlement in Spanish-language newspapers and on Spanish radio.

The individual notice packets were not the only means of notice

employed by Plaintiffs.  They also posted notice in newspapers,

arranged for announcements on the radio.

The notice and claims procedures did not systematically

leave out any class members.  Finally, the other factors to be

considered when evaluating the fairness of notice procedures have

been met.  The Notice of Settlement contained in the notice

packet informed the claimants that they had a right to object and

that they had a right to a privately-retained attorney.  (Doc.

31, Salazar Decl., Ex. B, 3).

The notice and claims procedures were fair.


**C.   Whether the Terms of the Settlement Are Fair, Adequate,
       and Reasonable.**

First, Plaintiffs argue that the $1,017,500.00 figure is

fair because it is a compromise between the figures Plaintiffs

and class members would likely be awarded depending on which

legal theory regarding damages calculation prevailed.  If the

"work days" calculation, which is that used in the Ninth Circuit,

is used, Plaintiffs and class members would be awarded a total of

about $467,000.  Plaintiffs do not explain the formula they used

to arrive at this figure, although neither Dole nor the class

members object to the calculation.  The figure in the Settlement Agreement is almost twice what Plaintiffs and class members would likely receive if the case went to trial and if the trial court used the "work days" calculation.

Plaintiffs also argue that prompt settlement avoids the delays inherent in litigation and appeal.  Plaintiffs argue that "by settling without proceeding to trial, or engaging in pre-trial motions, money that might otherwise have been expended to defend the litigation is being paid to the class."  (*Id*. at 16).

In addition, Plaintiffs argue that the amount of attorneys' fees that are available to Plaintiffs' counsel under the Settlement Agreement is less than 15% of the total settlement amount.  This amount is separate from the $1,017,500 which is to be divided among the class members.

Plaintiffs also describe their extensive experience with employment discrimination cases, and in particular in representing minimum-wage farm workers.  (Docs. 38 & 39).

Plaintiffs' arguments are persuasive insofar as they address three of the factors in the reasonableness test: (1) the risk, expense, complexity, and likely duration of further litigation; (2) the amount offered in settlement; and (3) the experience and views of counsel.  These factors generally weigh in favor of fairness and adequacy.

First, inherent in all litigation is a certain level of risk and uncertainty.  There is a possibility that Plaintiffs would recover nothing, although there is little evidence in the record to allow for an accurate determination of the level of that risk.  In addition, even if Plaintiffs were to prevail, there is a

1  substantial risk that their legal theory for recovery would fail

2  since the "calendar days" formula is not law in the Ninth Circuit

3  and this court is bound to follow Ninth Circuit law.  If the

4  "work days" formula were used, plaintiffs would collect

5  substantially less.  Additionally, if the case were to proceed to

6  trial, the expense of litigation would reduce the class members'

7  recovery, not to mention considerably delaying such recovery as

8  well.  The first factor, risk and expense of litigation,

9  therefore weighs in favor of a finding of fairness.

10      Second, the amount allocated to each class member was

11  initially based on the calendar days formula, but each amount was

12  proportionally reduced when it was discovered that the total

13  amount due exceeded the total amount available.  The total amount

14  due (based on the calendar formula) was $1,133,037, but the total

15  amount available was $992,500 (i.e., $1,017,500 less the $25,000

16  reserve).  Each reward was proportionately reduced.

17      The Settlement Agreement provides that unallocated funds

18  (including the $25,000 reserve meant for late claims and to cure

19  errors) be distributed to a nonprofit organization.  This

20  arrangement is not fair, considering that "late claims" were not

21  defined in the Settlement Agreement and no potential "errors"

22  were identified.  Taking into account the overall fairness of the

23  Settlement Agreement, it is more appropriate for the unclaimed

24  and undistributed funds, including the $25,000 reserve amount, to

25  be proportionally distributed to the farm workers.  This solution

26  is particularly fitting considering that the amount each claimant

27  was due based on the average-daily-wage-times-sixty calculation

28  was proportionally reduced because the settlement amount was

1  approximately $116,000 less than the total based on the
2  calculation.

3      It is **ORDERED** that this provision of the Settlement
4  Agreement be stricken and any remaining reserve funds, unclaimed
5  funds, or otherwise undistributed funds shall be proportionally
6  divided among the class members.

7      Third, the attorneys' fees amount is also fair.  The total
8  amount to be awarded to plaintiffs' attorneys is capped, and does
9  not reduce the award to plaintiffs and class members at all.  The
10 $380 hourly rate that Plaintiffs' counsel Mr. Strauss charges is
11 higher than average hourly rates considered reasonable for senior
12 partners practicing law in the Eastern District of California.
13 However, considering Mr. Strauss' experience with employment
14 cases and similar class action litigation, the $380 hourly rate
15 is reasonable.  The same reasoning applies to the hourly rates
16 for the junior partners, associates, and paralegals at Mr.
17 Strauss' law firm.  The $325 hourly rate Ms. Rice charged for her
18 work is also reasonable, considering her 20 years of experience
19 with similar cases.  The average hourly rate in the Eastern
20 District of California for senior partners (with whose experience
21 Ms. Rice may be equated and where the CLRA Foundation is located)
22 is approximately $220 to $260.  However, the rates for Ms. Rice
23 are not grossly unreasonable and the Defendants do not object to
24 such rates.  Plaintiffs have also documented in detail the hours
25 worked by Miner, Barnhill & Galland and the CLRA Foundation, as
26 well as other costs and expenses incurred (including Westlaw,
27 travel, photocopying).  Most importantly, Plaintiffs' counsel are
28 not requesting that they be awarded the total amount of fees and

27

expenses spent on this case, which is about $270,000.  Instead, they have presented detailed records and arguments to show that an award of the maximum amount allowed for by the Settlement Agreement (i.e., $169,292) is reasonable.  Defendants do not object to this amount.  The higher hourly rates are offset by the fact that there will not be a full recovery of fees for all time worked.

Plaintiff offers no argument as to the remaining factors: (1) risk of maintaining class action status throughout the trial; (2) reaction of the class members to the proposed settlement; and (3) the stage of the proceedings.[14]

First, the risk exists that Dole would object to class certification if this case proceeded to trial because Dole only agreed to class certification for purposes of settlement and reserved its right to object to class certification.

Second, the Plaintiffs' submissions do not state the reactions of the class members to the proposed settlement, although it is reasonably inferrable that the reactions of those ultimately included in the class are positive since each will be receiving several thousand dollars as a result of the settlement. The most significant missing voice, however, is that of those class members who may have been left out of the class due to Plaintiffs' inadvertence or lack of systematic criteria.

Third, this is a settlement-only certification, so the standard against which fairness is judged is higher.  *Molski*, 318

---

[14] The only remaining factor, presence of a government participant, is not at issue because there is no government participant.

28

F.3d at 953.  The factors designed to protect absentees are significant.  *Id*.  As discussed at length above, the record shows that Plaintiffs made significant efforts and spent many hours to ensure that as few class members as possible were not included in the settlement.  The membership of the classes is a finite universe of individuals not exceeding 400, and 361 are included in the current proposal.

The remaining three factors therefore also weigh in favor of a finding of fairness.  Based on a review of the notice procedures and the substance of the Settlement Agreement, the terms of the settlement, particularly the amount, which is on the high end of the defendants' exposure, are fair, adequate, and reasonable.

## V.   CONCLUSION

For all the reasons set forth above, the Class Settlement Agreement is **APPROVED** in the terms proposed with one exception;

Any unclaimed or otherwise undistributed funds, including but not limited to the $25,000 reserve fund, shall be proportionally divided to all class members.

**SO ORDERED.**

**DATED: April 18, 2005.**

1

2                                  /s/ OLIVER W. WANGER

3              _____

4                        Oliver W. Wanger

5              UNITED STATES DISTRICT JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28